# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs December 6, 2011

## STATE OF TENNESSEE v. ANTONIO SELLERS

**Direct Appeal from the Criminal Court of Shelby County**
**No. 09-04471     James M. Lammey, Jr., Judge**

---

**No. W2011-00971-CCA-R3-CD  - Filed March 27, 2012**

---

A jury convicted Antonio Sellers ("the Defendant") of second degree murder. The trial court subsequently sentenced the Defendant to twenty-three years of incarceration. In this appeal, the Defendant challenges (1) the trial court's ruling on an evidentiary issue regarding leading questions on redirect examination and (2) the sufficiency of the evidence. Upon our thorough review of the record, we have determined that the Defendant is entitled to no relief on the issues raised. Accordingly, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment
of the Criminal Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Stephen C. Bush, Shelby County Public Defender, and Barry W. Kuhn, Assistant Shelby County Public Defender (on appeal); Jennifer Case and Nicholas Cloud, Assistant Shelby County Public Defenders (at trial), Memphis, Tennessee, for the appellant, Antonio Sellers.

Robert E. Cooper, Jr., Attorney General & Reporter; David H. Findley, Senior Counsel; Amy Weirich, District Attorney General; and Stacy McEndree, Assistant District Attorney General; for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

Charles Boswell, Jr., the victim in this case, was shot and killed on December 1, 2008, in Shelby County, Tennessee. Charles Boswell, Sr., the victim's father, testified that the victim was twenty-seven years old at the time of his death. The day before his death, the

victim told his father that his apartment had been broken into. Boswell told his son to move back home with him, and the victim began packing up his belongings.

Fred Wilbourn testified that he lived in the same apartment complex as the victim. He knew the victim from having worked together on some odd jobs. Their apartments were in adjacent buildings, both on the ground floor. After Wilbourn came home after work on December 1, 2008, he was taking a shower when he heard three shots. Wilbourn's son then came to him and told him that "Charles just got shot." Wilbourn went to his front door and saw the victim lying at Wilbourn's doorstep. He said it took about 30 seconds to walk from his bedroom to his door. Wilbourn called 911.

Wilbourn explained that, in his apartment building, there was an exterior door in the building itself, and inside this door were some steps that led to the upstairs apartments. Wilbourn's apartment shared a wall with the staircase. The victim was lying right outside the interior door into Wilbourn's apartment. The victim's legs were lying across the doorway and his upper body was on the first two or three steps. The victim's cousin from upstairs was holding the victim. The exterior door was closed and Wilbourn did not see anyone else. The police arrived in about a minute and medical personnel arrived about a minute later.

Thelma Issac testified that she lived in the same apartment complex as the victim. They lived in nearby buildings. On the morning of December 1, 2008, she was having an argument with Kenneth Wallace in her apartment. She left her apartment and saw "two young men standing on the sidewalk." She walked past them and heard them having a conversation but did not hear the words. She testified, "it wasn't a pleasant conversation." She recognized one of the men as the victim. She recognized the other man as someone she had occasionally seen at the complex. She did not see either man with a weapon and did not see any physical contact between them.

Wallace followed her out of the apartment. When Issac saw him near the two men, she yelled at him "to move" because "he didn't have anything to do with what was going on there." Wallace moved behind a building, and Issac heard gunshots. She hid in the hallway of another apartment building for two or three minutes. When she came out, she saw Wallace in the area where the police were.

Issac subsequently viewed a photographic array and identified the man she had seen standing with the victim. On the array, she wrote, "This is the guy I saw arguing with Charles right before the shooting." Issac also identified the Defendant at trial. On cross-examination, Issac acknowledged that she did not see the shooting. She also acknowledged having told the police afterward that she had heard three gunshots. She described her emotional state after the incident as "hysterical."

Kenneth Wallace testified that he visited Issac's apartment frequently in 2008. He knew both the victim and the Defendant from having seen them around the complex on multiple occasions. Wallace was at Issac's apartment on the morning of December 1, 2008. They argued and she "stormed out." She walked about fifty yards away, and he walked after her. He noticed the Defendant "[k]ind of like walking behind" him. The Defendant was about ten feet behind Wallace. Wallace stopped and was looking toward Issac, who had also stopped. He then saw the victim walking up from his left, and he saw the victim and the Defendant meet. Wallace testified:

> And the next thing I know is, I heard [the Defendant] tell the deceased – something to the effect, that "You don't want none of that." You know. At that point, Ms. Issac told me to get out of the way – not in those words; but, you know, she told me to move back. Okay. And when I did that, I kind of like ducked on the side of the building where I was standing at.

> And that's when I heard gunshots.

Wallace said that the men were about two and a half feet apart when he heard the Defendant speak to the victim. He did not see anything in their hands. He heard the gunshots after he ducked beside the building, so he did not see who fired the shots. He heard the shots seconds after he ducked beside the building. Prior to his departure from the area of the confrontation, he did not see anyone else. He heard three shots. He then heard the victim say "Help."

When he emerged from his hiding place, Wallace saw the victim at a stairway on the inside of one of the apartment buildings. The victim's cousin was holding him. Wallace saw the paramedics pick the victim up and put him in the ambulance. He did not see where the Defendant went.

Wallace identified a photograph of the victim to the police. He also identified a photograph of the Defendant from a photo array, writing "This is the shooter" below the Defendant's photograph. He made this identification on the afternoon of the shooting. Wallace also identified the Defendant at trial as the person he heard say, "You don't want none of this" to the victim. Wallace never saw either of the two men with a weapon. On cross-examination, Wallace acknowledged having told the police that he had seen the two men getting into each other's faces and squaring off.

Christina Every testified that she was home in her upstairs apartment in the complex when she heard arguing. She went to her window and looked out. She saw the victim arguing with a man she did not know. They were standing about a foot and a half apart. She did not see anyone else. Although she did not see a weapon, she heard three gunshots and

saw the victim get shot. The shooter ran and the victim ran into one of the buildings. Every explained that the victim was trying to leave when the other man shot him. She was unable to make a positive identification when the police later showed her a photographic array containing the Defendant's photograph. She, however, did identify the Defendant at trial as the person she saw arguing with the victim. She also testified that the Defendant was "the one [she] saw shooting Charles Boswell." On redirect, Every explained that she had seen the men bump shoulders prior to the shooting.

Cedric Leach testified that he was living in an upstairs apartment in the complex at the time. On December 1, 2008, he testified, he "s[aw] a man get shot and killed right in front of" his apartment. He was inside his apartment with his girlfriend when she told him that there were two men out front arguing. He looked out the window and saw "both of the young men standing face-to-face exchanging words. And one man pushed another, and another man pulled out a gun and shot." This was during the day and he had a clear view of the event. The men were facing each other and two to three feet apart. The victim pushed the other man with both hands. The other man, whom Leach identified at trial as the Defendant, pulled a gun and shot. Leach testified that the Defendant aimed at the victim's chest. The Defendant then ran. Leach testified that he heard four to seven shots. The victim was holding himself, screaming something, and managed to get into the stairwell. Leach saw no weapon in the victim's hands. Leach spoke with the police later that day and identified the Defendant from a photographic array. Under the Defendant's photograph, Leach wrote, "This is the guy that shot a man in cold blood." Leach testified that the detective suggested the words "in cold blood."

On cross-examination, Leach acknowledged that, during the preliminary hearing, he testified that the victim had "wanted to fight." He also acknowledged that he had never seen the Defendant before December 1, 2008. On redirect, he clarified that, during the preliminary hearing, he testified that both of the men he had observed had been looking for a fight. He also recalled that he had seen Wallace at the side of the building. According to Leach, it did not appear as though Wallace was involved in the altercation.

Markell Lee testified that he was living in the complex in December 2008. His apartment was on the second floor. He was home on December 1. He testified that he was cousins by marriage with the victim and that they were "best friends." The victim lived in the apartment building behind the building that Lee lived in. On December 1, they "were trying to move [the victim's] stuff out [of] the house so he c[ould] . . . start all over." Lee explained that the victim was preparing to move back to his father's house to save money. Lee also stated that the victim's apartment had been broken into.

Lee and the victim got everything packed up by early afternoon and were waiting for a friend of theirs who had a truck. Lee suggested that they go and wait in Lee's apartment.

The victim told Lee to go ahead and that he would join Lee in a few minutes. Lee left, went to his apartment, and dozed off for about twenty minutes. He then heard five or six gunshots, fired from close by. He heard the victim call his name three times. Lee jumped up and ran outside; he found the victim lying near the staircase downstairs and saw that the victim had been shot. He asked the victim who his assailant was, but the victim was unable to reply. He stayed with the victim until the police and paramedics arrived. He did not see a weapon on the victim.

Officer Victor Lester of the Memphis Police Department testified that he responded to the scene at 1:34 p.m. and was the first officer there. He found the victim slumped over on the stairs in a stairwell. He said the victim "had been shot and wasn't breathing."

Bryan Lilly testified that he was a firefighter/paramedic for the City of Memphis. He responded to the scene and examined the victim. He did not find a pulse and the victim was not breathing. He and his partner loaded the victim into the ambulance and attempted resuscitation but were unsuccessful. They transported the victim to The Med.

Wendy Seely, also a paramedic, worked with Lilly to resuscitate the victim. She testified that the victim "didn't respond to any of our drugs, any of our CPR, or any of our ventilation."

Dr. Miguel Laboy, a forensic pathologist, testified that he performed the autopsy on the victim on December 2, 2008. He opined that the cause of death was multiple gunshot wounds. He described one bullet wound that perforated the left chest in two places, but was unable to determine which was the entrance wound and which was the exit wound. There was another bullet wound to the front right chest with no corresponding exit wound. The bullet that made this wound perforated the victim's left lung and the right ventricle of the victim's heart. Dr. Laboy did not locate the bullet. There was also a bullet wound to the victim's left buttock that was an entrance wound. Dr. Laboy recovered the bullet that caused this wound from the victim's left groin. This bullet perforated the victim's left illiac bone, the psoas muscle, and caused tears to the victim's sigmoid colon and small intestine. There was an additional bullet wound to the victim's right hand which Dr. Laboy described as "a superficial penetrating defect." No bullet associated with this wound was recovered. Dr. Laboy testified that the bullet wound to the victim's right chest was "a lethal injury." Dr. Laboy also testified that the victim's death was caused by multiple gunshot wounds, not the medical intervention that ensued.[1]

---

[1] It appears that one of the defense theories was that the victim's death resulted from the medical treatment rendered after he was shot.

Sergeant Mundy Quinn of the Memphis Police Department homicide bureau testified that he presented the photographic array to Leach. After Leach made the positive identification, he told Leach "to circle the picture and to write a brief sentence as to what happened." He stated that the words on the photographic array were Leach's.

Patricia Turnmire of the Memphis Police Department crime-scene unit testified that she responded to the scene. She and her partner, Officer Jones, took photographs and collected evidence. They recovered seven nine-millimeter shell casings and one bullet fragment.

Shelly Betts, Tennessee Bureau of Investigation Special Agent Forensic Scientist, testified that she examined the seven fired nine-millimeter caliber cartridge cases recovered from the scene. She determined that all of the cartridge cases had been fired from the same gun. She also examined the bullet recovered from the victim's body and testified that it was consistent with bullets loaded into nine-millimeter cartridges.

Deborah Carson of the Memphis Police Department homicide bureau testified that she was the case coordinator. She obtained a warrant for the Defendant's arrest on December 9, 2008. He was not apprehended until the following March, however, and the parties stipulated as follows:

> On March 26, 2009, the [D]efendant . . . was located and arrested at a residence in Olive Branch, Mississippi by United States marshals from the Western District of Tennessee and Olive Branch Police Department officers on a Shelby County warrant for murder in the second degree. He was taken to the DeSoto County Jail where he was housed for four days. He waived extradition to Shelby County and was transported by Shelby County Sheriff deputies to the Shelby County Jail where he was booked in at 12:43 P.M. on March 30th, 2009.

The State rested after this proof.

The defense offered proof through Ashley Callonas, a nurse who assisted in the victim's treatment at The Med, that the victim's medical records indicated that the victim had a gunshot wound to the left ventricle of his heart.

In rebuttal, the State called Dr. Norma Edwards, who treated the victim upon his arrival at The Med. Dr. Edwards explained the efforts to resuscitate the victim and to repair the hole in his heart, which included a thoracotomy. In the thoracotomy, the victim's chest was opened and his sternum was split so that medical personnel could massage his heart. She explained that, while she thought at the time that the gunshot injury was to the left ventricle,

in retrospect, she thought that the medical examiner was "probably right" that the injury was actually to the right ventricle, because the medical examiner had more time to examine the heart. Dr. Edwards also testified that, whether the injury was to the left or the right ventricle made "absolutely no difference whatsoever." She added, "A hole in either ventricle caused by a wound is going to kill you whether it's the right ventricle or the left ventricle if you can't get it fixed. It makes zero difference."

Dr. Edwards also testified that, at the time the victim arrived at The Med, he "had no signs of life." She elaborated: "[H]e was dead at the time he was brought in. He had no blood pressure; he had no pulse; he had no reflexes; he had no vital signs." She testified that, in her opinion, there was nothing improper done in rendering medical treatment to the patient by either the paramedics or the personnel at The Med.

The jury found the Defendant guilty of second degree murder as charged in the indictment. After a sentencing hearing, the trial court sentenced the Defendant to twenty-three years of incarceration.

On appeal, the Defendant argues that the trial court erred when it overruled a defense objection to the prosecutor's leading questions during her redirect examination of Cedric Leach. The Defendant asserts in his brief that there were "two bases for this objection. One, it is a leading question, and, two, the response was not properly introduced as refreshed recollection." The Defendant also contends that the evidence is not sufficient to support his conviction of second degree murder and, at most, supports only a conviction of voluntary manslaughter.

## Analysis

### *Objection to Questions on Redirect Examination of Leach*

Leach testified on direct examination that, as he watched from his second floor window, he saw the Defendant shoot the victim. During cross-examination, the defense impeached Leach by references to his testimony at the preliminary hearing. Additionally, the following colloquy transpired during cross-examination:

Q: Now, you testified today that as you watched from the window, and as all of these events were happening, from start to finish, it all took about two to three minutes. Is that correct?

A: Or maybe longer. But, yes, that's what I said.

Q: Two or three or maybe more minutes, right?

A.  Yes, ma'am.

Q.  Okay.  And during that time, you didn't see anybody out there other than the shooter and the victim, correct?

A:  Yes, ma'am.

On redirect, the prosecutor asked Leach, "Did you see somebody else out there at one point – another male out there?"  The defense objected on the basis that the question was leading.  The trial court overruled the objection and concluded that the prosecution could use leading questions on redirect as to this issue.  The prosecutor then directed Leach to look at page 5 of the preliminary hearing transcript and "read to [himself] that first answer."  Leach did so and then testified that he did not remember saying "that."  The following then transpired:

Q:  Okay.  Tell the jury, the guy – did you see a guy that testified yesterday? – somebody by the name of Kenneth Wallace?

A:  Are you talking about – yeah, I did see him on the side of the building – I s[aw] him on the side of the building.  And I don't remember what he was – I don't remember exactly how long I s[aw] him or, you know.  I do remember him being there, you know, on the side of the building.  You refreshed my memory actually seeing him here, yesterday, that he was on the side of the building.  So, yeah, I s[aw] him.

Q:  How far away was he from these other people when you saw him?

A:  He wasn't far.  He was on the side of the building, you know.  He had [gone] – I think he had left – I think after he had seen it getting a little heated – I mean, there were no guns out there, there was just two people stand[ing] in front of – he just left.  You know, I guess there wasn't much for him to see.  You know, I don't know where he went after that.

We agree with the Defendant that the prosecutor used a leading question when she asked Leach if he had seen "a guy that testified yesterday? – somebody by the name of Kenneth Wallace?"[2]  We, however, disagree that the Defendant thereby is entitled to any relief.  "It is well-settled that the propriety, scope, manner and control of the examination of

_____

[2] Although the defense did not object to this specific question, counsel was abiding by the trial court's previous ruling.  We therefore address the issue on the merits.

witnesses is a matter within the discretion of the trial judge." State v. Caughron, 855 S.W.2d 526, 540 (Tenn. 1993); see also State v. Chearis, 995 S.W.2d 641, 645 (Tenn. Crim. App. 1999) ("The admissibility of testimony and other evidence, as well as the scope of redirect examination, is within the discretion of the trial court."). Accordingly, we review a trial court's ruling on an objection to the form of a question for abuse of discretion. See Caughron, 855 S.W.2d at 540. Furthermore, unless we determine that the form of the question was not only improper, but that the improper question was also clearly prejudicial, we will not interfere with the trial court's decision. Mothershed v. State, 578 S.W.2d 96, 99 (Tenn. Crim. App. 1978). Here, Wallace already had testified that he was near the scene of the shooting. Issac also had testified that Wallace was nearby. The corroboration provided by the leading question was therefore of only slight significance. We hold that the Defendant suffered no prejudice by the trial court's ruling. Accordingly, he is entitled to no relief on this basis.

As to the Defendant's argument to this Court that Leach's "response was not properly introduced as refreshed recollection," we note that this ground of objection to the prosecutor's questions on redirect was not raised to the trial court. Therefore, this issue has been waived. See Tenn. R. App. P. 36(a); State v. Mickens, 123 S.W.3d 355, 375-76 (Tenn. Crim. App. 2003) (defendant waived those arguments against the admissibility of evidence that were not raised at trial).

*Sufficiency of the Evidence*

We turn now to the Defendant's claim that the evidence is not sufficient to support his conviction of second degree murder. Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). See also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellate court does not weigh the evidence anew; rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). The same standard of review applies to guilty verdicts whether based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

Second degree murder is defined as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1) (2006). Our Supreme Court has determined that second degree murder is a "result of conduct" offense. See State v. Brown, 311 S.W.3d 422, 431-32 (Tenn. 2010); State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000). Accordingly, the appropriate statutory definition of "knowing" in the context of second degree murder is as follows: "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b) (2006); see Brown, 311 S.W.3d at 431.

In this case, the direct and circumstantial proof established that the Defendant raised a gun and fired seven shots at the victim while the two men were standing only a few feet apart. The victim sustained multiple gunshot wounds, including a lethal wound to his heart. This Court has held that deliberately firing several shots at a person constitutes "knowing" conduct for purposes of establishing second degree murder. See, e.g., State v. Rickie Reed, No. W2001-02076-CCA-R3-CD, 2002 WL 31443196, at *5-6 (Tenn. Crim. App. Oct. 31, 2002) (proof sufficient to support second degree murder where defendant fired several shots into an occupied vehicle, killing a passenger); State v. Kenneth Anthony Henderson, No. M1999-00547-CCA-R3-CD, 2002 WL 537042, at *4 (Tenn. Crim. App. Apr. 11, 2002) (proof supported second degree murder conviction where defendant fired multiple shots at victim in broad daylight while victim sat in parked car); see also State v. Michael Clark, No. W2009-01649-CCA-R3-CD, 2011 WL 300211, at *3 (Tenn. Crim. App. Jan. 21, 2011), perm. appeal denied (Tenn. May 25, 2011) (proof supported attempted second degree murder conviction where defendant fired four or five times at victims sitting in car). We hold that the proof is sufficient to sustain the Defendant's conviction of second degree murder.

The Defendant contends that the proof established only voluntary manslaughter, defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a) (2006). The Defendant points to testimony that, before the victim was shot, he pushed or otherwise made bodily contact with the Defendant. The Defendant argues that this physical assault on him by the victim was sufficient provocation to produce a state of passion that led him to act in an irrational manner in committing the killing. We are not persuaded. It is well-settled that it is up to the trier of fact to determine whether a homicide is a second degree murder or a voluntary manslaughter. See State v. Williams, 38 S.W.3d 532, 539 (Tenn. 2001); State v. Johnson, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995); State v. Sentorya L. Young, No. M2005-01873-CCA-R3-CD, 2008 WL 2026108, at *6 (Tenn. Crim. App. May 12, 2008). When the evidence is sufficient to support a second degree murder, we will not disturb the jury's decision in this regard.

## Conclusion

The Defendant's alleged errors do not entitle him to a reversal of his conviction. Accordingly, we affirm the judgment of the trial court.

_____
JEFFREY S. BIVINS, JUDGE